# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>NEDERLANDER OF SAN<br>FRANCISCO ASSOCIATES,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)<br>)</td><td>C.A. No. 2018-0701-TMR</td></tr>
<tr><td>CSH THEATRES LLC, CSH CURRAN<br>LLC, CSH PRODUCTIONS, LLC,<br>CURRAN LIVE, LLC, CAROLE<br>SHORENSTEIN HAYS, JEFFREY<br>HAYS, and THOMAS HART,</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td>Defendants,</td><td>)<br>)</td><td></td></tr>
<tr><td>and</td><td>)<br>)</td><td></td></tr>
<tr><td>SHORENSTEIN HAYS-<br>NEDERLANDER THEATRES LLC,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Nominal Defendant.</td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: November 13, 2018
Date Decided: November 30, 2018

Tammy L. Mercer and M. Paige Valeski, YOUNG CONAWAY STARGATT &
TAYLOR, LLP, Wilmington, Delaware; Matthew L. Larrabee and Benjamin M.
Rose, DECHERT LLP, New York, New York; Michael S. Doluisio, DECHERT
LLP, Philadelphia, PA; *Attorneys for Plaintiff.*

Raymond J. DiCamillo, Susan M. Hannigan, and Sarah T. Andrade, RICHARDS,
LAYTON & FINGER P.A., Wilmington, Delaware; David B. Tulchin, Brian T.
Frawley, and Andrew J. Finn, SULLIVAN & CROMWELL, LLP, New York,
New York; *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

The parties in this case have a long history together. Certain of the parties are members of Shorenstein Hays-Nederlander Theatres, which operated three theaters in San Francisco playing Broadway-style shows beginning in the 1970s. The other parties are affiliates of the members. Shorenstein Hays-Nederlander Theatres owned two of the theaters and leased the third. Although the partners and later members and their affiliates had some disagreements through the years, they seem to have mostly gotten along until 2010. In 2010, the theater that Shorenstein Hays-Nederlander Theatres leased, the Curran, came up for sale by its previous owner. Shorenstein Hays-Nederlander Theatres was unwilling to pay the price that the previous owner wanted, but Carole Shorenstein Hays, an affiliate of one of Shorenstein Hays-Nederlander Theatre's members, decided to purchase the Curran through an entity she controlled called CSH Curran.

That purchase and the surrounding events were the subject of a previous lawsuit in this Court. The core allegations were that Hays had agreed to lease the Curran to Shorenstein Hays-Nederlander through CSH Curran and that Hays had breached her fiduciary and contractual obligations to Shorenstein Hays-Nederlander by staging Broadway-style productions that she or an affiliate controlled at the Curran in violation of the operative LLC Agreement. In my Post-Trial Memorandum Opinion, I held that CSH Curran was bound by the LLC Agreement as an affiliate, but no new or renewed lease of the Curran existed. I also defined the

2

meaning of control under the terms of the LLC Agreement and held that owning the Curran was not equivalent to controlling every production that played there. I held, however, that CSH Curran controlled one production at the Curran based on a contractual right of first refusal.

The current dispute between the parties relates to two new productions at the Curran. Pending before me is Plaintiff's Motion for Preliminary Injunction asking this Court to enjoin Defendants from staging *Dear Evan Hansen* ("*DEH*") and *Harry Potter and the Cursed Child* ("*Harry Potter*") within 100 miles of San Francisco (and particularly at the Curran) until final resolution of Plaintiff's claims in this case. For the reasons that follow, I deny Plaintiff's motion.

## I. BACKGROUND

The facts of this case derive from the pleadings, the affidavits, and the exhibits submitted to this Court.[1]

### A. The Previous Litigation

Plaintiff Nederlander of San Francisco Associates ("Nederlander," together with its affiliates, the "Nederlander Entity") and Defendants CSH Theatres LLC ("CSH Theatres"), Carole Shorenstein Hays ("Hays"), Jeff Hays (together with Carole Shorenstein Hays the "Hayses," together with their affiliates, the

---

[1] This opinion assumes familiarity with *CSH Theatres*, *LLC v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *3 (Del. Ch. July 31, 2018).

"Shorenstein Entity"), and Thomas Hart were long-time business associates in the theater industry in San Francisco.[2] CSH Curran LLC ("CSH Curran") owns the Curran Theatre (the "Curran").[3] CSH Productions, LLC ("CSH Productions") was the vehicle for Hays's investment in the musical *Fun Home*.[4] Curran Live operates the Curran.[5] CSH Theatres and Nederlander each own fifty percent of Shorenstein Hays-Nederlander Theatres LLC ("SHN" or the "Company"), which directly owns two theaters in San Francisco, the Orpheum and Golden Gate Theatres, and for many years leased a third theater, the Curran, from its previous owner.[6]

In 2010, Hays, who at the time was Co-President and Director of SHN, caused an affiliate entity to purchase the Curran from its previous owner after SHN declined to buy the Curran.[7] On February 21, 2014, CSH Theatres sued Nederlander (the "First Action") based on a series of disputes related to a purported promise by Hays to renew the lease of the Curran to Nederlander, as well as breaches of fiduciary

---

[2]     Compl. 2.

[3]     *Id.* at 5.

[4]     *Id.* at 15 (citation omitted).

[5]     *Id.* at 6.

[6]     *Id.* at 2-5; *CSH Theatres*, 2018 WL 3646817, at *3.

[7]     Compl. 2.

4

duties and contractual obligations.[8] "The claims at issue in [that] case [fell] into three broad categories: (1) those concerning the lease of the Curran; (2) those concerning breaches of the LLC Agreement; and (3) those concerning breaches of fiduciary duty."[9] This Court issued a final post-trial decision resolving the First Action (the "Opinion") on July 31, 2018.[10]

I focus on the holdings from the Opinion that are relevant to the current dispute. In the Opinion, I first held that "[u]nder [the] definitions in the LLC Agreement, the Hayses and any entities they control are Affiliates and part of the Shorenstein Entity and, therefore, are bound by Section 7.02(a)"[11] of the LLC Agreement and that "any actions they took in their capacities as controllers of CSH Theatres or CSH Curran were subject to the LLC Agreement."[12]

Second, I held that Sections 7.02, 7.03, and 7.06 of the LLC Agreement regarding competition must be interpreted together. I held that "[w]hile Section 7.02(a) requires the 'Shorenstein Entity' to 'devote their efforts to maximize the economic success of the Company and avoid any conflicts of interest between the

---

[8]    *Id.* at 13; *CSH Theatres,* 2018 WL 3646817.

[9]    *CSH Theatres*, 2018 WL 3646817, at *13.

[10]   Compl. 13.

[11]   *CSH Theatres*, 2018 WL 3646817, at *23.

[12]   *Id.* at *22.

5

Members,' Section 7.06 contains an exception."[13]   Under that exception, "any Member, any Affiliate of any Member or any officer or director of the Company shall be entitled to . . . engage in the ownership, operation and management of businesses and activities, for its own account and for the account of others."[14] Members, affiliates, directors, and officers may also "own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member."[15]   Furthermore, "[n]either the Company nor any Member shall have any rights in or to any independent ventures of any Member or the income or profits derived therefrom."[16]

The exception in Section 7.06, however, is not endless.  Section 7.02(b) sets the outer limits of Section 7.06:  it "disallows either the Nederlander or Shorenstein Entities from staging 'any Production that it controls (as defined in Section 7.03) within 100 miles of San Francisco,'"[17] unless "that production had played at one of the Company's theaters, the other Member's representative had turned down the

---

[13]      *Id.* at *24 (citation omitted).

[14]      *Id.* (quoting JX 10-25) (emphasis omitted).

[15]      *Id.* (quoting JX 10-25).

[16]      *Id.*

[17]      *Id.*

6

play, or 'the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members.'"[18] "Section 7.03 defines 'control over production' as: 'the Person having the ability to determine where the Production plays and the terms and conditions of said engagement.'"

Thus, the "plain language of the contract, when read through the lens of *generalia specialibus non derogant*, creates a detailed scheme governing competition."[19] Members, affiliates, directors, and officers may "compete with the Company, except that they cannot stage a production within 100 miles of San Francisco if they have 'the ability to determine where the [p]roduction plays and the terms and conditions of said engagement,'" unless they satisfy one of the three exceptions in Section 7.02(b).[20]

Applying this interpretation of the LLC Agreement, I held that Hays had controlled one play—*Fun Home*. "In 2014, after [Hays] had resigned as director and co-president of the Company, she entered into an investment agreement with the production *Fun Home* on behalf of her entity [CSH Productions]."[21] In order to receive the investment, "*Fun Home* agreed that if the production went on tour it

---

[18]    *Id.*

[19]    *Id.*

[20]    *Id.* (emphasis in original).

[21]    *Id.* at *25 (citing JX 290).

would not perform at any other Bay Area theater but the Curran,"[22] because "'an important inducement for [Hays's] significant investment in the Broadway Production is to obtain the first right to present the first commercial production of [*Fun Home*] in the Bay Area, preferably to launch the national tour.'"[23]   I held that "[t]his concession constitutes control over the production as defined in Section 7.03 because it allows [Hays] 'the ability to determine where the Production plays and the terms and conditions of said engagement.'"[24]

On August 6, 2018, Nederlander moved for clarification of the Opinion, asking this Court whether "(1) CSH Curran is itself part of the Shorenstein Entity for purposes of Section 7.02 of the LLC Agreement" and "(2) the Shorenstein Entity must comply with Section 7.02 by providing [Nederlander] and SHN with documents relevant to whether the Shorenstein Entity has 'control' over two productions that are scheduled to play at the Curran: [*Harry Potter*] and [*DEH*]."[25]

---

[22]    *Id.* (citing JX 290-4).

[23]    *Id.*

[24]    *Id.* (citations omitted).

[25]    Pl.'s Mot. for Clarification 2, *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCMR (Del. Ch. Aug. 6, 2018) (citation omitted).

On September 5, 2018, I issued an order (the "Order"[26]) denying the motion. I held that "the Opinion states that the Shorenstein Entity consists of CSH Theatres and its respective Affiliates. The Opinion also recognizes that [CSH Theatres] [admits] that Carole Hays, Jeff Hays, and CSH Curran are Affiliates. Thus, there is nothing to clarify."[27] The Order further held that "[t]he existence of [*DEH*] and *Harry Potter* is not new evidence about the definition of control under Sections 7.02(b) and 7.03 of the LLC Agreement. Instead, these productions at the Curran are new potential breaches, and [Nederlander] will have to litigate them as such."[28]

## B.    New Developments

There have been two significant developments since the end of the last trial. First, *DEH* signed a contract to show at the Curran. Second, *Harry Potter* will show at the Curran.

Hays and the producers of *DEH* engaged in a long courtship. Hays started by donating $25,000 to Arts Connection, a non-profit that helped teens see *DEH* and create art inspired by the show.[29] Stacey Mindich, the lead producer of *DEH*,

---

[26]    Order Den. Mot. for Recons. 2, *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCMR (Del. Ch. Sept. 5, 2018).

[27]    *Id.* (citation omitted).

[28]    Pl.'s Mot. for Clarification 2-3, *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCMR (Del. Ch. Aug. 6, 2018).

[29]    Valeski Aff. in Supp. of Pl.'s Opening Br. ("Valeski Aff.") Ex. 8, at 54.

thanked Hays and "wrote that she looked forward to 'finding ways to work with [Hays] in the coming months and years.'"[30] This provided the opening to negotiate a deal, which "included one particularly unique term: it required that the producer of [*DEH*] be guaranteed at least $1.3 million per week" in revenue.[31] On November 28, 2017, during negotiations, *DEH* asked for more money for Arts Connection, and Hays contributed an additional $200,000.[32]

After the trial ended in the First Action, Hays promised the producers of *DEH* "financial protection in the event that this Court enjoined the show from playing at the Curran" and promised to "personally cover 'not only losses arising from the litigation but also . . . any failure of CSH theater to remit the promised amounts . . . .'"[33] On December 11, 2017, Hays and the *DEH* producers entered into two agreements to memorialize these and other terms: the deal memo (covering the location, the schedule of performances, etc.) and the "Inducement and Agreement"

---

[30]     *Id.*

[31]     *Id.* Ex. 1 (Hays Deposition), 88:4-12.

[32]     *Id.* Exs. 37, 38.

[33]     *Id.* Ex. 22, at 278.

10

(covering protections in case of injunction).[34] *DEH* is scheduled to play at the Curran from December 5 to December 30, 2018.[35]

*Harry Potter* is a "sit-down production" intended to play at the same theater for several years.[36] Prior to the *Harry Potter* deal, Ambassador Theater Group ("Ambassador"), an international theater owner/operator, approached a Curran executive about the possibility of leasing the Curran long-term, with Ambassador controlling programming.[37] Hays pushed back on the programming point, and on February 16, 2018, Ambassador made a formal offer to lease the Curran and "work in close partnership with [Hays]" on programming, although her input would be limited.[38] Hays emphatically rejected this offer.

The sides eventually negotiated terms to Hays's liking, including (1) only allowing the presentation of "an extended sit-down production of *Harry Potter*" unless a replacement production is "approved in writing in advance by [Hays],"[39]

---

[34] *Id.* Ex. 39, at 1212-14 (the deal memo), 1215-17 (the Inducement and Agreement).

[35] Holland Aff. ¶ 6; Valeski Aff. Ex. 39, at 1214.

[36] Holland Aff. ¶ 12.

[37] Valeski Aff. Ex. 48, at 9531.

[38] *Id.* Ex. 50, at 9565.

[39] *Id.* Ex. 58, Ex. A, Sec. 9.

11

(2) guaranteeing revenue for Hays,[40] (3) Ambassador agreeing to hire current Curran personnel,[41] and (4) Hays maintaining control over physical alterations to the theater necessary for *Harry Potter*.[42]  CSH Curran LLC and ATG San Francisco, LLC signed a binding Memorandum of Understanding on April 20, 2018.[43]  Ambassador negotiated a separate show license with *Harry Potter*'s producers and signed it simultaneously.[44]  The Memorandum of Understanding requires Defendants to consent to the Show License,[45] and the Memorandum of Understanding recognizes that the lease is solely for the purpose of presenting *Harry Potter*.[46]  *Harry Potter* is due to play at the Curran in fall 2019[47] and is expected to run through December 31, 2022 absent an extension.[48]

---

[40]     *Id.* Ex. 58, Ex. A, Sec. 7.

[41]     *Id.* Ex. 58, Ex. C, ¶ 2.1.

[42]     *Id.* Ex. 58, Ex. A, Sec. 10.

[43]     *Id.* Ex. 58.

[44]     *Id.* Ex. 85.

[45]     *Id.* Ex. 69 § 12.2.

[46]     *Id.* Ex. 58, Ex. A, Sec. 4.

[47]     Holland Aff. ¶ 6.

[48]     Valeski Aff. Ex. 58, Ex. A, Sec. 5.

### C.    The Current Litigation

On September 25, 2018, Nederlander brought the action now pending before me. Nederlander claims Defendants breached the LLC Agreement, breached fiduciary duties, and aided and abetted breaches of contractual and fiduciary duties by entering into contracts to stage *DEH* and *Harry Potter* without first complying with Section 7.02(b) of the LLC Agreement.[49] Through this action, Plaintiff seeks to enjoin Defendants from staging these plays at the Curran.

## II.    ANALYSIS

Nederlander seeks a preliminary injunction to prevent Defendants from staging *DEH* and *Harry Potter* until this case concludes.[50] Nederlander posits that it has a reasonable probability of success on the merits because "[a]s the Shorenstein Entity had the ability to determine where [*DEH* and *Harry Potter*] would play (at the Curran) and the terms of the engagements, the Shorenstein Entity has control over [*DEH*] and *Harry Potter* under the LLC Agreement."[51] Since SHN has control and does not meet any of the exceptions in Section 7.02(b), SHN is violating the LLC Agreement.[52] Nederlander argues that it would suffer irreparable harm from

---

[49]    Compl. 2.

[50]    Pl.'s Mot. for Prelim. Inj. 1-2.

[51]    Compl. 4-5.

[52]    *Id.*

Defendants staging *DEH* and *Harry Potter* both because of a contractual stipulation that breach constitutes irreparable harm, and because of reputational damage it will suffer if the plays go forward.[53] Nederlander claims that the balance of equities weigh in its favor because while it will suffer irreparable harm, Defendants will only be required to comply with contractual obligations.[54]

Defendants object, arguing that the doctrines of *res judicata*[55] and collateral estoppel bar Plaintiff's claims.[56] Defendants also contend that Nederlander fails to establish the elements necessary for a preliminary injunction. Defendants argue that Plaintiff cannot show a reasonable probability of success on the merits because none of the Defendants "control" the plays as the LLC Agreement defines the term. Defendants argue that Nederlander cannot show an imminent threat of irreparable harm because the LLC Agreement provides for damages.[57] Defendants also argue that the balance of the equities weighs in their favor because an injunction would strip them of their property rights and harm their customers.[58]

---

[53]      *Id.* at 24.

[54]      Pl.'s Opening Br. 48-49.

[55]      Defs.' Opp'n Br. 31 (citation omitted).

[56]      *Id.* at 37 (citation omitted).

[57]      *Id.* at 53-57.

[58]      *Id.* at 57-61.

I begin my analysis by addressing the *res judicata* and collateral estoppel arguments. Then, I analyze the merits of the request for a preliminary injunction.

## A.    *Res Judicata*

Defendants first argue that Nederlander's claims are barred by the doctrine of *res judicata*, also known as claim preclusion.[59] Defendants argue that Plaintiff attempts to bring this second suit based on the same claims Plaintiff asserted in the First Action after a final judgment has been entered in the First Action against the same defendants.[60]

*Res judicata* plays an important role in our legal system.

> The doctrine of *res judicata* is common to all civilized systems of jurisprudence, and is based upon the salutary concept that the solemn decision of a competent court upon a disputed state of facts should forever set the controversy at rest. It embodies a rule of public policy that courts as well as litigants should have rest and repose from the vexatious renewal of the same law suit. Without the doctrine court systems would become impotent to perform their most important function, that of ascertaining and enforcing rights, for without it litigation would be endless. The doctrine rests upon the reasonable premise that a party who has once litigated, or has had the opportunity to litigate, the same matter before a court of competent jurisdiction, must thereafter hold his peace.[61]

---

[59]    *Id.* at 31.

[60]    *Id.*

[61]    *Epstein v. Chatham Park, Inc.*, 153 A.2d 180, 184 (Del. Super. 1959).

*Res judicata* "precludes a second attempt to litigate the same 'cause of action' and, under certain circumstances, matters which might have been litigated in the prior suit."[62]

> Central in the rule is the rationale that a person is entitled to an opportunity to once litigate a claim on its merits, and once only. Renewal of the same claim after disposition on its merits is not permissible, whatever the theory. But basic to the principle of rest and repose is the notion that one is entitled to his day in court on the merits of a claim. This means that a judgment for a defendant, which is valid and final but not 'on the merits,' is conclusive only as to what is actually decided.[63]

Delaware's application of the doctrine of *res judicata* is well developed and defined. It applies when

> (1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the [Plaintiffs] in the case at bar; and (5) the decree in the prior action was a final decree.[64]

---

[62]    *Hughes v. Trans World Airlines, Inc.*, 336 A.2d 572, 574 (Del. 1975) (citing *Ezzes v. Ackerman*, 234 A.2d 444 (Del. 1967)).

[63]    *Id.* (citing Restatement (First) of Judgments § 48 (Am. Law. Inst. 1942)).

[64]    *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1092 (Del. 2006) (citing *Bailey v. Wilmington*, 766 A.2d 477, 481 (Del. 2001)).

In order for *res judicata* to bar an action, a Defendant must prove that "Plaintiff has had a 'full, free, and untrammeled opportunity to present his facts,' but has neglected to present some of them or has failed to assert claims which should in fairness have been asserted."[65]

Under Delaware law, "a contract is considered a single 'transaction' for the purpose of claim preclusion."[66] Under the transactional approach, "[t]he procedural bar of *res judicata* extends to all issues which might have been raised and decided in the first suit," and "a contract that is the subject of sequential claims is regarded as a single transaction."[67] "Contractual rights that are triggered and pursued *after* the initial action is filed, however, are not barred by *res judicata* because a prior judgment cannot be given the effect of extinguishing claims which did not even then exist."[68] As the Delaware Supreme Court clarified in *RBC Capital Markets, LLC v. Education Loan Trust IV, LLC*, although Delaware follows a "transactional" approach when applying *res judicata*, "[a] subsequent breach of contract claim will

---

[65] *Fitzgerald v. Chandler*, 1998 WL 442440, at *6 (Del. Ch. July 20, 1998) (quoting *Maldonado v. Flynn*, 417 A.2d 378, 382 (Del. Ch. 1980)).

[66] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 192 (Del. 2009) (citation omitted).

[67] *RBC Capital Mkts., LLC v. Educ. Loan Trust IV, LLC*, 87 A.3d 632, 635 (Del. 2014) (citations omitted).

[68] *LaPoint* 970 A.2d at 192 (citation omitted).

17

not be treated as identical to an earlier contract claim . . . where the facts underlying the later claim were either unknown or incapable of being known at the time of the earlier action."[69]

Here, Plaintiff asks this Court to determine (1) whether Hays or her affiliate actually controls certain productions under the terms of the LLC Agreement and (2) whether the affiliate should be prohibited from staging these productions due to failure to comply with the terms of the LLC Agreement. I hold that *res judicata* does not apply to the claims asserted in this action because neither the third element (the same claim was previously before the court) nor the fourth element (the claim was previously decided adversely) is met. Plaintiff knew at the time of the first trial that *DEH* would play at the Curran,[70] but the contract was not signed until December 11, 2017, after trial ended in the First Action. Plaintiff did not become aware of the terms of the deal until Defendants produced the deal documents in October 2018,[71] after I issued the post-trial Opinion in the First Action. The *Harry Potter* contracts were not signed until April 20, 2018, after trial in the First Action, and Defendants only produced the *Harry Potter* documents in October 2018, after the post-trial Opinion in the First Action. Defendants argue that *res judicata* bars all actions that

---

[69]     *RBC Capital Mkts.*, 87 A.3d at 645 (citations omitted).

[70]     Pl.'s Reply Br. 4.

[71]     *Id.* at 4-5.

"could have been raised" in the prior litigation,[72] but the terms of the contract, and not the simple act of the play showing, give rise to Plaintiff's claims.

Thus, the alleged breaches occurred after the trial in the First Action ended, and the facts surrounding the purported indicia of control over *DEH* and *Harry Potter* were "unknown or incapable of being known." Defendants' interpretation of the application of *res judicata* would render the LLC Agreement unenforceable against future breaches because of one failed claim for breach of contract, which is not Delaware law. Whether Plaintiff's claims are an attempt to relitigate the meaning of "control" is a separate question, and I address it below. Plaintiff's claims that the same contractual terms (the control requirement) applies to a new set of facts (*DEH* and *Harry Potter*) are not barred by *res judicata.* I did not rule on whether CSH's productions of *DEH* and *Harry Potter* at the Curran constituted breaches of the LLC Agreement in my Opinion because the issue was not properly before me. I confirmed this in my Order when I held that that the productions of *DEH* and *Harry Potter* are "new potential breaches and Counterclaim Plaintiff will have to litigate them as such."[73]

---

[72]     Defs.' Opp'n Br. 31 (quoting *Branson v. Branson*, 2013 WL 1164827, at *2 (Del. Mar. 19, 2013)).

[73]     Order Den. Mot. for Clarification 3, *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCMR (Del. Ch. Sept. 5, 2018).

**B.      Collateral Estoppel**

Defendants next argue that collateral estoppel also bars Plaintiff from bringing its claims because Plaintiff simply attempts to relitigate the meaning of "control," which this Court decided in the First Action.[74]

Collateral estoppel is a parallel doctrine to *res judicata*. "The rule of collateral estoppel is a rule of repose designed to end litigation."[75] "[W]here a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive . . . [and] a party is estopped from relitigating the issue again in the subsequent case."[76] "Thus, the doctrine of collateral estoppel provides repose by preventing the relitigation of an issue previously decided. In addition, by putting an end to litigation, it conserves judicial resources."[77] "The test for applying collateral estoppel requires that (1) a question of fact essential to the judgment, (2) be litigated  and (3) determined (4) by a valid and final judgment."[78] "Whether the [previous] Court's conclusion is correct or not is irrelevant . . . . All

---

[74]      Defs.' Opp'n Br. 37.

[75]      *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del. 1968) (citing *Bata v. Bata*, 163 A.2d 493, 507 (Del. Ch. 1960)).

[76]      *Id.* (citations omitted).

[77]      *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991).

[78]      *Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995) (citing *Taylor v. State*, 402 A.2d 373, 375 (Del. 1979)).

that matters, for purposes of an issue preclusion inquiry, is whether the two decisions purported to address the same issue."[79]

Defendants argue that this action is collaterally estopped because "[Nederlander] seeks to litigate the theory that a theatre owner or operator necessarily has 'control over' a production under Section 7.02(b)—the same theory it argued in the first case."[80]  Plaintiff concedes (as it must) that I determined the meaning of control, but Plaintiff argues that "[t]he fact that 7.02(b) does not apply to all shows," as I held in my Opinion, "does not mean it applies to none" and that "[t]he *only* specific discussion of 'control' was the Court's finding that Defendants controlled *Fun Home*."[81]

In the First Action, Plaintiff effectively argued that ownership equals control.[82]  I rejected this interpretation of the LLC Agreement.  Instead, I determined that members, affiliates, directors, and officers are "allowed to compete with the Company, except that they cannot stage a production within 100 miles of San Francisco if they have 'the ability to determine where the [p]roduction plays and the

---

[79]     *Acierno v. New Castle Cty.*, 679 A.2d 455, 460 (Del. 1996).

[80]     Defs.' Opp'n Br. 38.

[81]     Pl.'s Reply Br. 11 (emphasis in original) (citation omitted).

[82]     *See, e.g.*, Opp'n to Mot. to Dismiss 30, *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCMR (Del. Ch. Sept. 9, 2014).

21

terms and conditions of said engagement'" unless they meet one of the exceptions under 7.02(b).[83] Based on that interpretation of Section 7 of the LLC Agreement, I held that Hays controlled the production of *Fun Home* because a previous investment in that show gave her "the first right to present the first commercial production of the [p]lay in the Bay Area."[84] I held "[t]his concession constitutes control over the production as defined in Section 7.03 because it allows [Hays] 'the ability to determine where the Production plays and the terms and conditions of said engagement.'"[85]

Now Plaintiff asserts a new argument about control. Plaintiff essentially argues that staging—*i.e.*, presenting—a play equals control. Plaintiff's purported evidence of Hays's control over the productions of *DEH* and *Harry Potter* includes items such as (1) Hays negotiating for months, with aid of counsel, before agreeing to terms to produce specific shows;[86] (2) Hays providing a personal guarantee of revenue to the *DEH* producers;[87] (3) Hays leasing the Curran for a term linked to the

---

[83] *Id.*

[84] *Id.* at 25.

[85] *Id.* (quoting JX 10-25).

[86] Pl.'s Opening Br. 13.

[87] *Id.* at 12-13.

22

expected duration of *Harry Potter*;[88] and (4) Hays being unwilling to sign the contract with Ambassador unless it included specific terms she desired, particularly related to staffing and branding the production of *Harry Potter* in a way that would benefit the Curran's brand.[89] Plaintiff effectively argues that any exercise of Hays's ownership of the Curran beyond a long-term, passive lease with no influence over programming is equal to control. Under Plaintiff's interpretation, Defendants control every play that is staged (*i.e.* presented) at the Curran if they engage in the "making of the agreement" or if they retain any influence over programming.[90] Plaintiff argues that Defendants may own the Curran and Broadway-style shows may play at the Curran without competing. For example, Plaintiff states that the previous owners of the Curran "owned the theater, but they did not control any production that played at the theater because they (unlike the Defendants) agreed to a lease that ceded control over particular shows and their terms to SHN."[91] Under this interpretation, SHN, not the previous owner, staged shows. Thus, in essence, Plaintiff argues that Defendants control any production that they stage.

---

[88]    *Id.* at 24-25.

[89]    *Id.* at 25-27.

[90]    Pl.'s Reply Br. 14.

[91]    *Id.* at 15 (emphasis omitted).

For me to find that the two arguments—ownership equals control (from the previous litigation) and staging a production equals control (from this litigation)—are the same and the second is barred by collateral estoppel, I would have to believe that staging a production equals ownership. Although the ability to stage a play at a theater you own may be an important stick in the bundle of property rights we call ownership, it is not the only right in the bundle. Even if I held that Hays could not stage Broadway-style plays at her theater because staging is control, she would retain other core ownership rights such as the right to rent out the theater (albeit under restrictions), the right to sell the land, the right to occupy the land, and so forth. The ability to stage a play is not the same as ownership. Thus, collateral estoppel does not bar Plaintiff's claims.

## C. The Request for Injunctive Relief

I turn now to the merits of Plaintiff's request for this Court to grant a preliminary injunction in its favor. Plaintiff seeks a preliminary injunction to prevent Defendants and their associates from staging productions of *DEH* or *Harry Potter* within 100 miles of San Francisco, including at the Curran, on the basis that Defendants have not met any of the three exceptions in Section 7.02(b) that allow Defendants to stage a play they control at the Curran.[92]

---

[92] Pl.'s Mot. for Prelim. Inj. 1-2 (quoting Compl. Ex. 1 § 7.02(b) ("(i) such Production has first played in one of [SHN's] Theatres; or (ii) such Production has been rejected for bookings at one of the Theaters by the other Member's representative on the

24

"The relief afforded by a preliminary injunction is both powerful and extraordinary. As such, it is not granted lightly."[93] "The Court of Chancery has broad discretion in granting or denying a preliminary injunction."[94] "A preliminary injunction may be granted where the movants demonstrate: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[95] "The moving party bears a considerable burden in establishing each of these necessary elements. Plaintiffs may not merely show that a dispute exists and that plaintiffs might be injured; rather, plaintiffs must establish clearly each element because injunctive relief 'will never be granted unless earned.'"[96] Yet, "there is no steadfast formula for the relative weight each [element]

---

Board of Directors; or (iii) the Company shares in the profits and/or losses of any booking" through an agreement between SHN and the competing member)).

[93] *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at *5 (Del. Ch. June 7, 2010).

[94] *Data Gen. Corp. v. Dig. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49 (Del. 1952)).

[95] *Nutzz.com, LLC v. Vertrue, Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005).

[96] *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007) (citing *Lenahan v. Nat'l Comput. Analysts Corp.*, 310 A.2d 661, 664 (Del. Ch. 1973)).

deserves. Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another."[97]

### 1. Reasonable Probability of Success on the Merits

Plaintiff argues that it has shown a reasonable probability of success on the merits because Defendants breached the LLC Agreement by "stag[ing] any Production" (under Section 7.02(b)) "that it controls" (under Section 7.02(b), with control defined under Section 7.03) without meeting any of the exceptions allowing them to compete (under Section 7.02(b)).[98]

The question of whether Defendants breached the LLC Agreement requires me to interpret the terms of the LLC Agreement. "Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members."[99] When interpreting an LLC agreement like this one, "Delaware [courts]

---

[97] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)). The parties disagree as to the appropriate standard in this case. Plaintiff argues that it is attempting to enforce the status quo, not change it, so the prohibitory injunction standard applies. Defendants disagree, and suggest that the status quo is where things stand at this moment. Because Plaintiff is attempting to change the status quo, Defendants say, Plaintiff must meet the higher standard for a mandatory injunction. Because I conclude that Plaintiff does not show a reasonable probability of success on the merits sufficient to satisfy the lower standard, I do not decide which standard applies.

[98] Compl. Ex. 1 §§ 7.02(b), 7.03, 7.06.

[99] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009).

adhere[] to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[100] Contracts are interpreted as a whole, and each provision and term will be given effect as to not render any part "mere surplusage" or "meaningless or illusory."[101] If a contract is "clear and unambiguous," then the Court "will give effect to the plain-meaning of the contract's terms and provisions."[102] Alternatively, "a contract is ambiguous . . . when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[103] If a contract is ambiguous, a "court may then look to extrinsic evidence to uphold to the extent possible, the reasonable shared expectations of the parties at the time of contracting."[104]

In the Opinion, I determined that members, affiliates, directors, and officers may "compete with the Company, except that they cannot stage a production within

---

[100] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[101] *Id.* at 1160 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010), and *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[102] *Id.* (citing *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[103] *Rhone-Poulenc*, 616 A.2d at 1196 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

[104] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).

100 miles of San Francisco if they have 'the ability to determine where the [p]roduction plays and the terms and conditions of said engagement'" unless they meet one of the exceptions under Section 7.02(b).[105]  I must now evaluate Plaintiff's contention that the circumstances surrounding the production of *DEH* and *Harry Potter* evidence control—the ability to determine where to produce the plays and the terms and conditions of said engagement.

Plaintiff points to the terms of the contracts regarding the productions of *DEH* and *Harry Potter* as evidence of control.  Plaintiff argues that these contracts demonstrate the Defendants' ability to determine where *DEH* and *Harry Potter* play—at the Curran.  Plaintiff also contends that these contracts show Defendants' control over the terms and conditions under which *DEH* and *Harry Potter* will play.  According to Plaintiff, the terms and conditions that Defendants control include, for *DEH*, "[t]he financial terms, the number of performances, the dates, the duration of the show.  Ticketing fees, for example, facility fees, . . . . Seat sales, sale dates, the dynamic pricing arrangement."[106]  For *Harry Potter*, Plaintiff argues that Defendants' control over terms and conditions include that Hays "had to approve the manager of [the] operation . . . . [and got] priority seating requirements for

---

[105]    *CSH Theatres*, 2018 WL 3646817, at *24 (quoting JX 10-25).

[106]    Oral Arg. Tr. 18:3-9.

28

subscribers."[107]  Hays also had final say over physical renovations to the theater.[108]

Plaintiff acknowledges that none of the Defendants had any preexisting rights to force *DEH* or *Harry Potter* to play at the Curran.  For example, Plaintiff acknowledges that *DEH* or *Harry Potter* could have chosen to play at an SHN theater without breaching any obligation to any of the Defendants.[109]  Likewise, Plaintiff acknowledges that all the terms and conditions are the product of negotiations that occurred simply because Hays's affiliate owns the Curran and she had the ability to say no to a request to use the Curran on terms that she did not find agreeable.[110] According to Plaintiff, however, none of that matters.

Plaintiff interprets "control" to exist under the LLC Agreement anytime Defendants "stage" (*i.e.*, present) a show directly (rather than through a passive lease with another party controlling all programming such as the choice of production, pricing, marketing, etc.).[111]  Plaintiff argues that this control can occur at any time

---

[107]  *Id.* at 21:1-11.

[108]  *Id.* at 20:13-24.

[109]  *Id.* at 29:21-30:5.

[110]  Valeski Aff. Ex. 144 (Wilson Dep.) 53:21-54:10 ("Q.  If the producers didn't agree to the terms, then the show wouldn't play at the Curran, correct?  A.  Yes.  Q.  And if the [Hayses] didn't agree to the terms, then the show wouldn't play at the Curran, correct?  A.  Correct.").

[111]  Oral Arg. Tr. 27:6-16.

prior to the staging of the show, whether two years before staging the show (based on something like the right of first refusal in *Fun Home*) or two days before the staging of the show (based on a contract allowing the production to play).[112] Therefore, Plaintiff argues, the control over the productions of *DEH* and *Harry Potter* that Defendants gained through the contracts they signed booking those productions to play at the Curran is sufficient to make the productions subject to Defendants' "control" as defined in Section 7.03. This, Plaintiff explains, is because Defendants were involved in negotiating the terms and could have rejected them at any time, preventing *DEH* and *Harry Potter* from playing at the Curran.[113] I disagree with this interpretation.

Section 7.02 says that "neither [party] will stage any Production that it controls (as defined in Section 7.03) within 100 miles of San Francisco" unless (1) the production first plays in a NSF theater, (2) NSF rejected the production, or (3) the two agree on how to share the profits.[114] Plaintiff's interpretation would

---

[112]  *Id.* at 27:12-16.

[113]  *See, e.g.*, Valeski Aff. Ex. 144 (Wilson Dep.) 53:15-20 ("Q. Do you agree that the producers and the Curran have joint control over the final terms that were agreed upon? A. Yes."); *id.* at Ex. 143 (Rogers Dep.) 100:10-15 ("Q. Does CSH control whether it's willing to enter into an agreement with [Ambassador]? A. CSH controls, yes. Q. Does it control whether it's willing to agree to certain terms with [Ambassador]? A. Yes.").

[114]  Compl. Ex. 1 § 7.02(b).

make parts of Section 7.02 unnecessary surplusage. If, as Plaintiff contends, to stage a production is to control it,[115] Section 7.02's limits on a member or affiliate's ability to "stage a Production that it controls (as defined in Section 7.03)" is repetitive, because "that it controls (as defined in Section 7.03)" adds nothing to the sentence. This interpretation creates surplusage.

Although the text of Section 7 is unambiguous and I need not look to extrinsic evidence, the contractual history further supports my interpretation. As I wrote in the Opinion, Section 4 of the partnership agreement for SHN's predecessor entity required that "[n]either party will stage any production within 100 miles of San Francisco" unless it meets the same three exceptions available under Section 7.02(b).[116] By contrast, Section 7.02 of the LLC Agreement only places limits on members' ability to show productions that they "control." Thus, "Section 7.02 of the LLC Agreement is substantially similar to Section 4, except that 'Shorenstein Entity and Nederlander Entity' replaced 'partners,' and instead of a prohibition on any production within 100 miles, there is only a prohibition on *controlled* productions within 100 miles."[117] I concluded that "Section 7.02(b) seems to strike

---

[115] *See* Section II.B, Collateral Estoppel.

[116] *CSH Theatres*, 2018 WL 3646817, at *76.

[117] *Id.* at *77.

31

a balance by applying to more people, but in a more limited way."[118]  The parties explicitly rejected language limiting the ability to "stage" a production in favor of language limiting the ability to show productions that a party "controls."  This is further evidence that "stage" and "control" do not have the same meaning.

Plaintiff's interpretation would also render parts of Section 7.06 surplusage. Section 7.06 lays out a series of ways that members, affiliates, directors, and officers may compete against the Company, with a narrow circumstance where they may not. Section 7.06 allows any member or affiliate to "have business interests and engage in business activities . . . without having or incurring any obligation . . . to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities."[119]  Section 7.06 allows members, affiliates, directors, and officers to engage in "ownership, operation and management of businesses and activities, for its own account and for the account of others . . . [including] interests in the same properties in which the Company or the other Members own an interest."[120] Plaintiff's interpretation would reduce Section 7.06 to only allowing competition when the member or affiliate is a passive, uninvolved investor.  This interpretation

---

[118]    *Id.*

[119]    Compl. Ex. 1 § 7.06.

[120]    *Id.*

32

would make large parts of Section 7.06—for example, the language regarding the ability to operate and manage a business for its own account and others' accounts—unnecessary surplusage.

Finally, Plaintiff attempts to analogize these plays to *Fun Home*, but the circumstances are substantially different. In *Fun Home*, Hays invested in the production company in exchange for a right of first refusal if the play showed in the San Francisco Bay Area.[121] Hays created a situation where the producers of *Fun Home* would have breached their contract by playing elsewhere.[122] By contrast, here the producers of *DEH* and *Harry Potter* openly negotiated with multiple venues, which competed against each other to hold the productions. Greg Holland of SHN confirmed that he "tried to convince the producer of [*DEH*] to show that show at one of the SHN Theatres,"[123] but the producer declined at least in part based on the Curran's more "intimate" setting.[124] Holland also attempted to convince the producers of *Harry Potter* to choose an SHN theater; Holland exchanged emails with the producers of *Harry Potter* and sent the producers technical specifications for

---

[121] *CSH Theatres*, 2018 WL 3646817, at \*25.

[122] Oral Arg. Tr. 29:21-30:2.

[123] Transmittal Aff. of Sarah T. Andrade in Supp. of the Defs.' Opp'n Br. ("Andrade Aff.") Ex. 106 (Holland Dep.) 29:2-6.

[124] Wilson Aff. ¶ 25.

SHN theaters, but to no avail.[125]  The parties engaged in an open competition to show both *DEH* and *Harry Potter*.  Defendants had no independent right or authority to cause *DEH* or *Harry Potter* to play at the Curran or to set the terms for either play.  Thus, the facts of *Fun Home* do not apply.

Plaintiff's interpretation is not reasonable and would impermissibly turn large parts of Section 7 of the LLC Agreement into "mere surplusage."  The terms of Section 7 of the LLC Agreement are not ambiguous.  Staging does not mean control under the LLC Agreement.  Thus, I hold that Plaintiff has failed to show a likelihood of success on the merits.[126]

### 2.    The Footnoted Fiduciary Duty Claim

Nederlander raises in a footnote that it has brought claims for breach of fiduciary duty and aiding and abetting and that these have "a reasonable probability of success" because CSH is a member and  fifty percent owner of SHN, leading to "common law and contractual fiduciary duties."[127]   "As such, the individual defendants who ultimately control CSH likewise owe fiduciary duties."[128]

---

[125]    Defs.' Opp'n Br. 26-27 (citing Exs. 121-122).

[126]    Because Plaintiff fails to show a reasonable probability of success on the merits, I decline to address imminent threat of irreparable harm, balance of the equities, the appropriate size of an injunction bond, or estoppel.

[127]    Pl.'s Opening Br. 40 n.6 (citations omitted).

[128]    *Id.*

Nederlander also asserts in the same footnote that even if some Defendants "did not breach duties they owed directly, they knowingly participated in the transactions that violated those duties. Accordingly, they are liable as aiders and abettors."[129] Defendants argue that I should ignore this argument both because "standalone arguments in footnotes are usually not considered fairly raised in any court"[130] and because "the Court already ruled 'that Members are not transformed into fiduciaries of one another by way of the LLC Agreement.'"[131] Plaintiff did not respond either in its Reply or at oral argument.

Plaintiff addresses the issue so summarily in its footnote that it lends no assistance to its argument about reasonable probability of success on the merits. Plaintiff does not mention the issue at all in its sections on Irreparable Harm or Balance of the Equities. Finally, because Defendants objected to the issue as not properly raised, and because Plaintiff did not respond to that objection either in its Reply Brief or at Oral Argument, it appears that Plaintiff has abandoned this argument. Thus, I decline to rule on the fiduciary duty claim.

---

[129] *Id.*

[130] Defs.' Opp'n Br. 50 (citing *Sabree Envtl. & Constr. v. Summit Dredging*, 149 A.3d 517, 2016 WL 5930270, at *1 (Del. Oct. 12, 2016) (TABLE)).

[131] *Id.* (quoting *CSH Theatres*, 2018 WL 3646817, at *21).

35

## III.   CONCLUSION

For the foregoing reasons, I conclude that Plaintiff has not satisfied the requisite elements for preliminary injunctive relief.   Thus, I DENY Plaintiff's Motion for a Preliminary Injunction.

**IT IS SO ORDERED.**