SONITROL HOLDING COMPANY,
a Delaware Corporation, Defendant
Below, Appellant/Cross–Appellee,

v.

MARCEAU INVESTISSEMENTS, a
French Corporation, Plaintiff Below,
Appellee/Cross–Appellant.

Supreme Court of Delaware.

Submitted: March 17, 1992.
Decided: May 14, 1992.

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington (Peter Van N. Lockwood (argued), Graeme W. Bush, James Sottile, IV, Caplin & Drysdale, Chartered, Washington, D.C., of counsel), for appellant/cross-appellee.

Charles F. Richards, Jr. (argued), Michael J. Feinstein, Matthew J. Ferretti, Richards, Layton & Finger, Wilmington, for appellee/cross-appellant.

Before MOORE and HOLLAND, JJ., and RIDGELY, President Judge (sitting by designation pursuant to Del. Const. art. IV, § 12).

MOORE, Justice.

Sonitrol Holding Company ("Sonitrol") appeals a decision of the Court of Chancery permitting an investor, Marceau Investissements ("Marceau"), to purchase 212,246 shares of Sonitrol Class B Stock as a consequence of Sonitrol's failure to achieve certain financial results under an agreement with Marceau. We affirm that ruling. Marceau cross appeals from the trial court's order permitting Sonitrol's chief executive officer, Harry S. Flemming ("Flemming"), to "put" certain Sonitrol stock owned by Flemming back to Marceau. We conclude that Flemming's put right was cancelled under the agreement with Mareau because Sonitrol failed to achieve certain net after tax earnings. Accordingly, we reverse as to that issue.

## I.

### A.

Marceau is a French corporation which, before this dispute arose, owned 49% of Sonitrol's Class A voting common stock and 49% of Sonitrol's Class B non-voting common stock. The following persons acted on behalf of Marceau in connection with the issues before us: Pierre Martel ("Martel") (Marceau's current managing director), Xavier Namy ("Namy") (Marceau's former managing director), and Phillipe Meziere ("Meziere") (an investment manager employed by Marceau).

Sonitrol is a Delaware corporation which manufacturers and distributes electronic security products through its wholly-owned subsidiaries. Flemming is Sonitrol's President, Chairman, Chief Executive Officer, and controlling stockholder.[1] Also involved in this dispute is Christopher W. Cobb ("Cobb") (Sonitrol's Chief Financial Officer).

### B.

In 1987, Sonitrol was in need of capital. Flemming began searching for an investor. He was introduced to Marceau through a business acquaintance, Namy. Flemming sent Namy Sonitrol's financial projections for fiscal years 1989 and 1990. Meziere analyzed and determined a value for Sonitrol based upon Flemming's financial projections. In reaching his conclusions Maziere considered that Flemming's forecasts were overly optimistic.

After lengthy negotiations, Marceau agreed to invest $20 million in Sonitrol in return for both a debt and equity position in the company. This culminated in several separate agreements:

*The Stock Purchase Agreement*

Marceau and Sonitrol executed an Agreement For Purchase of Stock and Notes, dated as of June 30, 1988 (the "Purchase Agreement"). By its terms Marceau purchased 49% of Sonitrol's Class A voting stock and 49% of Sonitrol's Class B non-voting stock for $9 million. Marceau also

purchased a Variable Rate Subordinated Convertible Serial Note Due 1996 (the "Note") for $11 million.

From the very beginning of the parties' negotiations, it is clear that Marceau was concerned with Sonitrol's ability to meet the earnings forecasted in Flemming's financial projections. In order to protect its investment, should Sonitrol's performance be less than anticipated, Marceau had a number of provisions included in the Purchase Agreement and the Note which were designed to give Marceau greater control of Sonitrol in the event that the company did not meet its earnings projections. One such provision, which is now at the center of this controversy, is Section 4.7 of the Purchase Agreement. Section 4.7 entitled Marceau to purchase additional Class B stock of Sonitrol if Sonitrol failed to meet certain minimum levels in net after tax earnings ("NATE") for fiscal years 1989 and 1990. Specifically, Section 4.7 provided:

> In the event that both (i) the Net After Tax Earnings of Sonitrol (as defined in Section 4.8) for the fiscal year ended June 30, 1989, are less than $1,800,000 and (ii) the Net After Tax Earnings of Sonitrol for the fiscal year ended June 30, 1990, are less than $4,300,000 then Purchaser [Marceau] shall have the right to purchase a number of shares of Class B Stock ... for the price of $1.00 per share....

The number of Class B shares which Marceau would be entitled to purchase under Section 4.7, if the NATE requirements were not met, was calculated as follows:

> ... such that the percentage of outstanding shares of Common Stock held by Purchaser [Marceau] after giving effect to such purchase shall be equal to the lesser of (x) nine million divided by the product of Net After Tax Earnings minus $300,000 for the fiscal year ended June 30, 1989, multiplied by twelve, and (y) 75% of Sonitrol's total outstanding capital stock as of September 30, 1990 after giving effect to such purchase (excluding any shares issuable upon conver-

---

1. Before this dispute, Flemming owned the 51% of Sonitrol stock not owned by Marceau.

sion of the Notes or the exercise of the options provided in the Option Agreement or this Agreement).

Thus, Marceau could purchase that number of shares which would result in it owning a percentage of Sonitrol's outstanding shares equal to $9,000,000 divided by [12 × (1989 NATE − $300,000)], up to a maximum of 75%. It is clear that the purpose of this section was to ensure that as Sonitrol's 1989 NATE fell below $1.8 million, Marceau would gain a greater equity position in Sonitrol up to a maximum of 75%.[2]

### The Note

Under the terms of the Note, Marceau was entitled to convert certain principal amounts into specified quantities of Class A and Class B Sonitrol stock. The conversions could enable Marceau to become Sonitrol's controlling shareholder.

### The Option Agreement

The parties entered into an Option Agreement which gave Flemming the right to make equalizing purchases of Sonitrol stock if Marceau acquired additional shares pursuant to the Note. Flemming's option rights would be canceled, however, if Sonitrol's 1989 NATE were less than $800,000, or if its 1990 NATE were less than $2,800,000.

### The Shareholders Agreement

A Shareholders Agreement was entered into by Sonitrol, Marceau and Flemming. The agreement provided Flemming a right to "put" all of his Sonitrol stock to Marceau if certain financial conditions were met and Marceau obtained voting control of Sonitrol by conversion of the Note.[3] The Shareholders Agreement provided, however, that Flemming will lose his put right if NATE for 1989 were less than or equal to $300,000, or if NATE for 1990 were equal to or less than $1,300,000.

### C.

Soon after entering into the aforementioned agreements, it became clear to Flemming that Sonitrol was not going to be as profitable as he had originally anticipated. Cognizant of the implications poor financial performance would have on his control of Sonitrol, Flemming sought to substantially revise the parties' agreements. For example, in a letter to Namy dated January 24, 1989 (less than seven months after Marceau's investment), Flemming suggested that all financial incentives in the parties' agreements be postponed or modified, and concluded that "continuing with the present plan is financially and otherwise unattractive." Despite his overtures, Marceau steadfastly refused to modify the agreements.

Faced with losing control of Sonitrol, Flemming undertook a series of accounting changes to, at least on paper, improve Sonitrol's earnings. Flemming's activities can be described, at best, as creative and, at worst, as fraudulent and deceitful. Sonitrol altered the accounting for a number of intangible assets. A number of the new accounting policies were substantially different from those accounting policies contained in the financial projections which were annexed to the Purchase Agreement (the "Exhibit Financials"), and resulted in the inflation of Sonitrol's NATE. Most significantly, Sonitrol extended the amortization periods in its financial statements as compared with the Exhibit Financials for franchise contracts (from 12 to 25 years) and customer contracts (from 10 to 11 years).[4] These accounting changes had the

---

2. Ironically, the clearest description of how Section 4.7 works was contained in a handwritten chart prepared by Cobb, Sonitrol's chief financial officer, on a chart detailing the incentive and penalty provisions. Cobb's notes state, *inter alia:*

 Under 1.3 MM—75%
 1.4 MM—68%
 1.5 MM—63%
 1.6 MM—58%
 1.7 MM—54%

This demonstrates that Sonitrol was fully cognizant of Section 4.7's operation. *See also Marceau,* slip op. at 38 n. 19 (reproducing memo sent from Meziere to Cobb fully explaining Section 4.7's operation).

3. In other words, Marceau would be forced to "buy out" Flemming's entire interest in Sonitrol.

4. The Exhibit Financials provided, in pertinent part, that: 1) the value of franchise contract rights is amortized over twelve years using the straight-line method, and 2) the value of cus-

effect of increasing Sonitrol's net income. Despite these accounting changes, Flemming's fears materialized when it was reported that Sonitrol's NATE for 1989 were $933,834.[5]

While the aforementioned accounting changes were sufficient to preserve Flemming's option and put rights for 1989, additional measures were "required" for 1990. It was at this time that Flemming began exploring the possibility of changing Sonitrol's accounting policies from United States generally accepted accounting principles ("US GAAP") to United Kingdom generally accepted accounting practices ("UK GAAP"). Flemming began consulting with bankers and accountants in London ostensibly to explore a possible listing of Sonitrol stock on the London Stock Exchange. However, correspondence with Hill Samuel, an English merchant banking firm, demonstrates that Flemming was well aware that United Kingdom accounting standards would make Sonitrol's financial statements "more attractive" profitwise. Flemming's true interest in UK GAAP is further evidenced by a memo sent by Cobb to Flemming demonstrating that Sonitrol's NATE would dramatically improve if UK GAAP were utilized.[6] Despite the attractiveness of UK GAAP, Flemming learned from a number of sources in England that Sonitrol stock would not be well received by the UK market.

At the end of fiscal year 1990, Sonitrol had its financial statements prepared in accordance with US GAAP. Sonitrol's financial performance was unimpressive—NATE for 1990 were $1,438,969.[7] Sonitrol did not release these financials to Marceau but, instead, surreptitiously had prepared financial statements for both 1989 and 1990 in accordance with UK GAAP. Marceau

was not told of this covert change and, when Marceau inquired as to why it had not received Sonitrol's financial statements when anticipated, was told that there had been an "unanticipated delay."

Finally, Sonitrol provided Marceau with the restated 1989 and 1990 financial statements prepared using UK GAAP. These statements reflected 1989 NATE as $2,670,000, and 1990 NATE as $3,540,020. Sonitrol did not inform Marceau of the financials prepared for 1990 using US GAAP. Only after Marceau made a formal demand pursuant to 8 *Del.C.* § 220 did Sonitrol provide Marceau with the financial statements initially prepared in accordance with US GAAP.

On October 15, 1990, Flemming wrote to Marceau stating that Sonitrol was entitled to prepare its financials in accordance with UK GAAP and, for the first time, took the position that, under Sonitrol's interpretation of the Purchase Agreement, Section 4.7 gave Marceau no rights to purchase additional stock unless NATE for 1989 were below $315,306. By letter dated November 6, 1990, Martel informed Sonitrol that Marceau was exercising its rights pursuant to Section 4.7 of the Purchase Agreement and that Sonitrol's use of UK GAAP was not allowed under the terms of the Purchase Agreement. Sonitrol and Flemming rejected Marceau's position and this litigation ensued.

### D.

Marceau sued for declaratory and injunctive relief in the Court of Chancery. The dispute centered around two major issues:

---

tomer contracts acquired is amortized over ten years using the straight-line method.

**5.** Thus, the first "triggering" event for Marceau's right to purchase stock under Section 4.7 was satisfied (*i.e.,* 1989 NATE less than $1.8 million). However, Flemming's option right and put right were not extinguished as 1989 NATE exceeded the minimum required to retain those rights (*i.e.,* $800,000 and $300,000, respectively).

**6.** For example, NATE for 1989 would increase from $900,000 under US GAAP, to $2.7 million

under UK GAAP, thus resulting in Marceau not having any stock purchase rights under Section 4.7.

**7.** 1990 NATE of $1,438,969 triggered Marceau's Stock Purchase rights under Section 4.7 and canceled Flemming's option right under the Option Agreement. Flemming's "put" right, however, was not canceled because 1990 NATE exceeded $1,300,000.

*Marceau's Rights Under Section 4.7*

Marceau claimed that it enjoyed rights under Section 4.7 to purchase 212,246 Class B Sonitrol shares at $1 per share as determined by Section 4.7's formula. Sonitrol contended that Section 4.7 was never triggered because its NATE for 1989 and 1990 (as computed in accordance with UK GAAP) exceeded the thresholds under which Marceau's rights to purchase additional stock was triggered. In the alternative, Sonitrol argued that, under its interpretation of the Section 4.7 formula, Marceau had no right to purchase any additional Sonitrol stock.

The Court of Chancery concluded that the Purchase Agreement required that Sonitrol's financial statements be prepared in accordance with US GAAP. *Marceau Investissements v. Sonitrol Holding Company,* Del.Ch., C.A. No. 12065, Jacobs, V.C., slip op. at 35–36, 1991 WL 202185 (Oct. 2, 1991). Therefore, Sonitrol's NATE for 1989 and 1990 were below the thresholds of Section 4.7 and, accordingly, Marceau enjoyed the stock purchase rights it sought.[8] In addition, the court agreed with Marceau that it was entitled to purchase 212,246 Class B shares of Sonitrol at $1 per share pursuant to the formula contained in Section 4.7. *Id.* at 42.[9]

*Flemming's Rights*

The parties did not contest that, once US GAAP was adopted as the proper accounting standard, Flemming's right under the Option Agreement was canceled.[10] The only contested issue was whether Flemming still retained his put right under the Shareholders Agreement.

Flemming's put right would be canceled only if 1990 NATE were below $1.3 million. Marceau recognized that Sonitrol's 1990 NATE, as reported in accordance with US GAAP, were $1,528,000. Marceau argued, however, that Sonitrol's 1990 NATE exceeded $1.3 million only because Sonitrol, in violation of its obligations under the Pur-

chase Agreement, failed to follow the accounting policies utilized in the Exhibit Financials. In the alternative, Marceau claimed that Sonitrol failed to comply with US GAAP in preparing its 1990 financial statements.

The Court of Chancery found that Sonitrol was not contractually required to follow the accounting policies utilized in the Exhibit Financials and that, when preparing its financial statements for 1989 and 1990, it complied with US GAAP. *Id.* at 48, 57. Therefore, the court concluded that, because Sonitrol's 1990 NATE exceeded $1.3 million, Flemming retained his right to "put" all of his Sonitrol stock to Marceau if Marceau elects to exercise its conversion rights under the Note.

## II.

### A.

We turn first to Sonitrol's contention that the Court of Chancery erred in interpreting Section 4.7 of the Purchase Agreement.

■ The interpretation of contract language is reviewed by this Court *de novo. Oberly v. Kirby,* Del.Supr., 592 A.2d 445, 457 (1991); *Judge v. Rago,* Del.Supr., 570 A.2d 253, 255 (1990). To the extent the trial court's interpretation of contract language rests on findings concerning extrinsic evidence, however, this Court must accept those findings unless they are unsupported by the record and are not the product of an orderly and logical deductive process. *Judge,* 570 A.2d at 255 (citing *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972)).

### B.

Because Sonitrol has not appealed the Court of Chancery's decision regarding Sonitrol's contractual obligation to prepare

---

**8.** Sonitrol has abandoned its appeal of the Court of Chancery's decision concerning US GAAP vs. UK GAAP. Opening Brief at 1 n. 1.

**9.** This purchase would result in Marceau controlling 75% of Sonitrol's outstanding capital

stock. This was the maximum allowed under Section 4.7.

**10.** Flemming's option right was canceled when 1990 NATE were below $2.8 million.

its financial statements in accordance with US GAAP (as opposed to UK GAAP), the sole question in this claim is exactly how many shares, if any, is Marceau entitled to purchase under Section 4.7. Section 4.7 provides, in pertinent part, as follows:

> ... Purchaser [Marceau] shall have the right to purchase a number of shares of Class B Stock ... for the price of $1.00 per share ... such that the percentage of outstanding shares of Common Stock held by Purchaser after giving effect to such purchase shall be equal to the lesser of (x) nine million divided by the product of Net After Tax Earnings minus $300,000 for the fiscal year ended June 30, 1989, multiplied by twelve, and (y) 75% of Sonitrol's total outstanding capital stock as of September 30, 1990 after giving effect to such purchase ...

Using Sonitrol's 1989 NATE of $933,834, the result under clause (x) is 1.18. The parties agree up until this point.

Sonitrol contends that the result reached under clause (x) is, itself, a percentage. Hence, according to Sonitrol, Marceau is entitled to purchase such shares that would result in it owning the lesser of 1.18% and 75%, of Sonitrol's total outstanding capital. Since Marceau already owns 49% of Sonitrol's total outstanding capital, Sonitrol continues, Marceau is not entitled to purchase any additional shares under Section 4.7.

■ Marceau counters that the result reached under clause (x) (1.18) is a whole number and must be converted into a percentage. Thus, under Marceau's interpretation of Section 4.7, it would be entitled to purchase Class B shares in a quantity sufficient to have it own the lesser of 118% and 75% of Sonitrol's total outstanding capital stock. Under Marceau's construction, therefore, it would be entitled to purchase 212,246 of Class B shares which would result in it owning 75% of Sonitrol's total outstanding equity.

The Court of Chancery correctly found that, although Sonitrol's argument deserves credit for ingenuity, it is fatally flawed as a matter of evidence and logic. *Marceau*, slip op. at 37. We find that the language of Section 4.7 is unambiguous on its face and, furthermore, that its plain meaning to be that adopted by the trial court. While it is true that the result reached in clause (x) of Section 4.7 refers to a percentage, it does not necessarily follow that the result, itself, is a percentage. We believe that the result of clause (x) (1.18) is simply a whole number which must be converted into a percentage. Since "percentage" is defined as "a part of a whole expressed in hundredths," *Webster's Third New International Dictionary* (1961), 1.18 would be equivalent to 118 hundredths, thus 118%.[11]

Because we find the language of Section 4.7 unambiguous on its face, we need not consider any extrinsic evidence when interpreting the section. *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473, 478 (1991) (quoting *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339, 343 (1983)). However, we note that the section's plain and unambiguous meaning is corroborated by the parties' intentions. In fact, Sonitrol's interpretation is belied by its very own actions. Until litigation became likely, Sonitrol never interpreted Section 4.7 in any way other than as it is interpreted by this Court, the Court of Chancery, and Marceau. Indeed, there is even documentation in the record prepared by both Flemming and Cobb which demonstrates that their understanding of Section 4.7 was consistent with that of this Court. *See, e.g., supra* at 1179 n. 2.

Moreover, Sonitrol's present interpretation leads to wholly illogical results. Under Sonitrol's interpretation, Marceau

---

**11.** Indeed, the absurdity of Sonitrol's interpretation is demonstrated as follows: Sonitrol contends that the numerical result of clause (x) is, itself, a percentage because the term "percentage" is used in the language preceding clause (x). It would follow, therefore, that the term "percentage" would also modify the numerical result of clause (y) since "percentage" is used in the language preceding both clause (x) and clause (y). Thus, following Sonitrol's logic, the result of clause (y) (75%) would also be a percentage, hence, equal to (75%)%, or, .0075. Such a contention is wholly illogical and was rejected by Sonitrol's counsel at oral argument.

would have no right to purchase stock under Section 4.7 unless Sonitrol's 1989 NATE were below $315,306.[12] This result is totally inconsistent with the parties' agreement. Specifically, Section 4.7 set the trigger for 1989 NATE at $1.8 million. It also follows that, at $1.8 million in 1989 NATE, the Section 4.7 formula results in .50 or 50%. Thus, the trigger for Section 4.7 only has any meaning at all if Section 4.7 is interpreted in the way proposed by Marceau and accepted by the Court of Chancery.[13] Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless. *Seabreak Homeowners Ass'n, Inc. v. Gresser*, Del.Ch., 517 A.2d 263, 269 (1986), *aff'd*, Del.Supr., 538 A.2d 1113 (1988) (TABLE).

Sonitrol is attempting to rely on what it perceives to be the "plain meaning" of the Purchase Agreement. In reality, however, Sonitrol's interpretation is neither "plain" nor the "meaning" of Section 4.7 and is simply a futile attempt to frustrate the meaning, purpose, and intent of the parties' agreement. Accordingly, we affirm the trial court's decision finding that Marceau is entitled, under Section 4.7 of the Purchase Agreement, to purchase 212,246 shares of Class B stock of Sonitrol at $1 per share.

## III.

### A.

We next turn to Marceau's contention that the trial court erred when it found that Sonitrol was not obligated to follow the accounting policies utilized in the Exhibit Financials. It is undisputed that, had Sonitrol used the Exhibit Financials' accounting policies in preparing its financial statements for 1989 and 1990, its NATE would have been negatively affected.

As detailed above, Flemming enjoyed both option and put rights under the parties' agreements. However, both of these rights were canceled if either 1989 or 1990 NATE were below a certain level.[14] The parties do not dispute that Flemming's option right was canceled because 1990 NATE were less than $2.8 million. The parties disagree as to whether Flemming's put right was canceled. If Marceau accepted Sonitrol's 1990 NATE figure as valid, there would be no dispute as to the validity of Flemming's put right since Sonitrol's reported 1990 NATE were greater than $1.3 million, thus not canceling Flemming's put right under the terms of the Shareholders Agreement.

Marceau contends that Sonitrol's reported 1990 NATE are overstated and incorrect because Sonitrol's financial statements were not prepared using the Exhibit Financials' accounting policies. Specifically, Marceau points to two accounting policies used in preparing the Exhibit Financials which were not used in preparing Sonitrol's 1990 financial statements: 1) The amortization period of customer contracts acquired in the acquisition of Wormald Security, Inc., was extended from 10 years to 11 years,[15] and 2) the amortization period of franchise agreements acquired in an acquisition of another Flemming-controlled entity (Sonitrol Corporation) was extended from 12 years to 25 years. The parties do not dispute, and a report prepared by Arthur Andersen & Co. concludes, that, had the Exhibit Financials' accounting policies been followed for these two items, Soni-

---

12. 9,000,000 divided by [ (315,306 minus 300,000) × 12] = 49. Thus, under Sonitrol's interpretation, this would equal 49% at which point a decrease in NATE would give Marceau stock purchase rights under Section 4.7.

13. To accept Sonitrol's interpretation would mean that, even though Section 4.7 was triggered (by 1989 NATE being less than $1.8 million), it would have no effect at all until 1989 NATE dropped below $315,306.

14. Option rights were canceled if 1989 or 1990 NATE were below $800,000 or $2.8 million, respectively. Put rights were canceled if 1989 or 1990 NATE were below $300,000 or $1.3 million, respectively.

15. In addition, the Exhibit Financials anticipated these customer contracts being valued at $17,900,000. After the transaction occurred, the contracts were valued, for accounting purposes, at $7,241,000, with $10,659,000 being accounted for as Goodwill with an amortization period of 40 years. Neither the parties nor the Court of Chancery discussed the material effect this change had on Sonitrol's financial statements.

trol's 1990 NATE would have been $1,118,-000, thereby canceling Flemming's put right. Thus the issue is clear—was Sonitrol obligated to follow the accounting policies used in the Exhibit Financials? The Court of Chancery held that it was not. We disagree and reverse.

### B.

Section 7.2 of the Purchase Agreement states:

> *Exhibits.* All statements contained in any exhibits attached hereto or delivered by or on behalf of the parties hereto to the other shall be deemed representations or warranties, as the case may be.

It is not disputed that the Exhibit Financials are "Exhibits" for purposes of Section 7.2. The Court of Chancery held that the only representations made with regard to the Exhibit Financials were those contained in Section 3.1(d)(ii), *Marceau,* slip op. at 46, which provides:

> Sonitrol has furnished Purchaser [Marceau] with (a) a copy of the financial projections of Sonitrol Holding Company, Sonitrol Corporation, Sonitrol Management Corporation and Sonitrol Sales Corporation for the fiscal years 1989 and 1990, and (b) a pro forma consolidated balance sheet of Sonitrol and Subsidiaries, as of July 1, 1988, together with a description of the accounting policies utilized therein, both of which are attached as Exhibit 3.1(d)(ii) and Sonitrol represents and warrants that such projections and pro forma consolidated balance sheet (i) were prepared in good faith on the basis of information and assumptions which Sonitrol believes to be reasonable and (ii) have taken into consideration the changes in assets and capital structure resulting from the transactions contemplated hereby.

In addition, the Court of Chancery found that Section 7.2 is too general and "does not tell us the content of [the] representations or warranties." *Id.*

We find Section 7.2 to be an important provision of the parties' agreement with a clear and unambiguous meaning. The parties do not dispute that Marceau valued Sonitrol relying primarily on the financial projections provided by Flemming. Certainly as part of this valuation process, Marceau relied on the method of accounting used by Sonitrol in its financial projections. It seems obvious, therefore, that Section 7.2 had a very clear meaning—the statements accompanying the Exhibit Financials constituted representations and/or warranties as to the accounting policies which were to be used in the future. It would hardly seem sensible that Sonitrol would be entitled to make projections under one set of accounting policies, for purposes of Marceau's investment, and then alter those policies in the future to reflect Sonitrol's performance in a more favorable light. In order to protect against just this sort of practice, Marceau had the financial projections annexed to the Purchase Agreement as an exhibit which would be covered by Section 7.2.

 We disagree with the construction of the Purchase Agreement urged by Sonitrol and adopted by the Court of Chancery. The cardinal rule of contract construction is that, where possible, a court should give effect to *all* contract provisions. *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1114 (1985) (emphasis added) (citations omitted). It is true, as Sonitrol has argued, that "where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions." *Stasch v. Underwater Works, Inc.,* Del.Super., 158 A.2d 809, 812 (1960) (quoting Restatement (First) of Contracts § 236(c)). However, this argument presumes an inconsistency which does not in fact exist. Section 7.2 and Section 3.1(d)(ii) are in no manner inconsistent. Section 3.1(d)(ii) represents and warrants how the projections *were* prepared (*i.e.,* in good faith and taking into consideration certain contemplated transactions). Section 7.2 establishes that all statements made in the Exhibit Financials are deemed to be representation and/or warranties. A warranty is not only a promise that a certain fact is true as it is represented but also that the fact *will re-*

*main true in the future.* Black's Law Dictionary 1423 (5th ed. 1979) (emphasis added). Therefore, there is no inconsistency between Section 3.1(d)(ii) and Section 7.2 which requires that one section take precedence over the other.

Moreover, Sonitrol produced no evidence that it was required, as an accounting matter, to alter the amortization schedules of the intangible assets discussed above. Indeed, both parties produced credible evidence that the accounting policies used in both the Exhibit Financials and the actual financial statements were consistent with US GAAP.[16] It follows, therefore, that the predominant, if not the sole, reason for extending the amortization periods was to artificially inflate Sonitrol's net income.

## C.

To sum up, we hold that Section 7.2 made the statements contained in the Exhibit Financials warranties and/or representations. The statements accompanying the Exhibit Financials stated that franchise rights would be amortized over 12 years, and contract rights over 10 years. *See supra* at 1179 n. 4. When reporting its 1990 NATE, Sonitrol used amortization periods of 25 years for franchise rights and 11 years for contract rights. Had Sonitrol used the accounting policies for these intangible assets as established in the Exhibit Financials, Sonitrol's 1990 NATE would have been $1,118,000. If Sonitrol's 1990 NATE had been $1,118,000, Flemming's put right would have been canceled under the terms of the Shareholders Agreement.

Thus, Sonitrol's 1990 NATE, using the accounting policies it was contractually obligated to follow, were $1,118,000. Accordingly, the trial court's decision finding that Flemming's put right under the Shareholders Agreement was not canceled is erroneous.[17]

Based on the foregoing, the judgment of the Court of Chancery is AFFIRMED in part and REVERSED in part.

---

**16.** It should be noted, however, that even Sonitrol's expert recommended that customer contracts could realistically be amortized over 8 years as opposed to the 11 year period adopted by Sonitrol.

**17.** In light of our resolution of this issue, we need not consider the other issues raised by Marceau in its cross-appeal.