# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BENCHMARK INVESTMENTS LLC (D/B/A KELLY BENCHMARK INDEXES), | ) ) ) ) | C.A. No. N23C-03-171 MAA CCLD |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PACER ADVISORS, INC, | ) ) | |
| Defendant. | ) | |

Submitted: April 9, 2023
Decided: July 29, 2024

*Plaintiff's Motion for Partial Summary Judgment*:
**DENIED.**
*Defendant's Motion for Partial Summary* Judgment:
**GRANTED.**

## MEMORANDUM OPINION

Elizabeth A. Sloan, Esquire, of BALLARD SPAHR LLP, Wilmington, DE,  and Gregory M. Williams, Esquire (Argued), of SIDLEY AUSTIN LLP,  Washington, DC, Attorneys for Plaintiff.

Michael W. McDermott, Esquire (Argued), David B. Anthony, Esquire and Zachary J. Schnapp, Esquire, of BERGER MCDERMOTT LLP, Wilmington, DE, Attorneys for Defendants.

**Adams, J.**

1

# MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff and Defendant entered into an agreement for Defendant to serve as an investment advisor for Plaintiff. The agreement contained several provisions concerning the parties' rights and obligations in the event of a termination. Plaintiff provided two separate notices to Defendant indicating an "intent to terminate" subject to a non-party's approval of a reorganization of the involved funds. The non-party declined to accept the reorganization. Plaintiff asserts the rejection of the reorganization undermined the previous "intent" to terminate, and the agreement continues. Defendant conversely asserts the agreement terminated when the non-party declined the reorganization. The parties dispute how to interpret the termination language in their agreement and filed cross-motions for partial summary judgment as to Plaintiff's Count I on whether the Agreement has been terminated. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is **DENIED**, and Defendant's Motion for Partial Summary Judgment is **GRANTED**.

## II. RELEVANT FACTS

### A. The Parties

Benchmark Investments LLC (d/b/a Kelly Benchmark Indexes) ("Benchmark" or "Plaintiff") is a real estate index firm and Exchange Traded Fund

("ETF") sponsor.[1]  Pacer Advisors, Inc. ("Pacer" or "Defendant") is an investment advisor and is "associated with an established Delaware independent trust."[2]

## B.    The Agreement and its Alleged "Termination"

The parties entered into the ETF Services Agreement ("the Agreement") on November 21, 2017[3] wherein "Pacer agreed to serve as the investment advisor to the Benchmark Funds, which would be formed by the Pacer Funds Trust."[4]  On April 10, 2019, the parties entered into an Amendment to the Agreement wherein the parties addressed fee adjustments and waivers.[5]  On November 17, 2020, Kevin Kelly ("Kelly"), Benchmark's Founder and Managing Partner, emailed Sean O'Hara ("O'Hara"), President of PacerETFs Distributors, stating in relevant part:

> Please accept this email as written notice of Benchmark's intent to terminate the ETF Services Agreement without cause effective no earlier than May 6, 2021, the end of the Initial Term, pursuant to Section 6(c)(i) of the ETF Services Agreement.  Consistent with Section 6(c)(ii) of the ETF Services Agreement, Benchmark intends to present to PACER Advisors and the Board of the ETF Trust a proposal to reorganize the Funds into another investment company that

---

[1] *See* Aff. of Kevin R. Kelly, D.I. 43 [hereinafter "Kelly Aff."] at ¶ 1.  See the Amended Complaint ¶¶ 20–28 for a detailed description of "ETFs," "indexes," and the services provided by the parties as part of their contractual relationship.  These details are not relevant to the Partial Motions for Summary Judgment.

[2] Def.'s Answer to Am. Compl. [hereinafter "Answer"] at ¶ 3.

[3] Def.'s Mot. for Part. Summ. J. as to Count I [hereinafter "Def.'s Br."], Ex. A, ETF Services Agreement [hereinafter "The Agreement"].

[4] Am. Compl. ¶ 33. The Court notes Defendant's denial of any "characterization of the terms or conditions" of the Agreement and merely uses this language to give a general explanation of the Agreement, without attributing any legal significance to Plaintiff's description of the Agreement. *See* Answer ¶ 33.

[5] The Agreement (including the "Amendment to ETF Services Agreement" on the final two pages of the document).

3

Benchmark believes is in the best interests of the Funds and their shareholders.[6]

On Thursday April 22, 2021, Kelly sent O'Hara and Joe Thomson the following:

> Please accept this email as advance written notice that, no earlier than May 6, 2021 and pursuant to Section 6(c)(ii) of the ETF Services Agreement, Benchmark intends to present to PACER Advisors and the Board of the ETF Trust a proposal to reorganize the Funds into another investment company. Benchmark believes that such proposal is in the best interest of the Funds and their shareholders.[7]

On February 19, 2022, Kelly, on behalf of Benchmark, informed the Trustees of Pacer Funds Trust of Benchmark's proposed reorganization plan.[8]

On April 1, 2022, Benchmark notified Pacer that Pacer violated the Agreement "by fraudulently charging Benchmark unauthorized expenses wholly unconnected to the Agreement, including multiple charges for Pacer's legal expenses related to subpoenas served on it by Benchmark."[9] The email noted "[t]his notice of material breach is in addition to Benchmark's prior notice that it was terminating the Agreement without cause and its proposed plan of reorganization."[10] Pacer responded on April 29, 2022 asserting the alleged breach was "unfounded, incorrect, and without merit."[11]

---

[6] Def.'s Br., Ex. B at 1.
[7] *Id.*, Ex. C [hereinafter "Kelly Email: April 2021"].
[8] *Id.*, Ex. H.
[9] *Id.*, Ex. G.
[10] *Id.*
[11] *Id.*, Ex. I at 1.

4

On October 3, 2022, Pacer informed Benchmark that "the Reorganization Proposals do not appear to Pacer Advisors to be in the best interests of the Funds' shareholders and, therefore, Pacer Advisors is not contractually obligated under [the Agreement] to support the Reorganization Proposals."[12]

On October 14, 2022, the Special Committee of the Board of Trustees of the Pacer Funds Trust determined on behalf of the Trust not to support Benchmark's February 19, 2022 proposal.[13] Also on October 14, 2022, Pacer "accepted" Benchmark's Notice of Termination and indicated the Agreement was terminated effective October 31, 2022.[14] The Independent Fiduciary Trust also recognized Benchmark's termination effective October 31, 2022 in publicly-filed securities disclosures on October 14, 2022.[15]

On October 17, 2022, Benchmark responded to Pacer's October 14 email stating that Benchmark "has never served a 'notice of termination' under the

---

[12] *Id.*, Ex. K.

[13] *Id.*, Ex. D.

[14] *See id.*, Ex. E. The email read, in full:

> I write on behalf of my client, Pacer Advisors, Inc. ("Pacer Advisors"). Per the Benchmark Investments LLC (d/b/a Kelly Benchmark Indexes) ("Benchmark") notices of termination pursuant to Sections 6(c)(i) and 6(c)(ii) of the ETF Services Agreement between Benchmark and Pacer Advisors (the "Agreement") to Pacer Advisors dated November 17, 2020 and April 22, 2021, respectively (together, the "Benchmark Notices of Termination"), Pacer Advisors hereby accepts the Benchmark Notices of Termination and, accordingly, Benchmark's termination of the Agreement, effective as of October 31, 2022.

*Id.*

[15] *Id.*, Ex. F. "Effective as of October 31, 2022, Pacer Advisors, Inc. (the 'Adviser' [sic]) has accepted the termination by Kelly Benchmark Indexes (the 'Index Provider') of its services as the Index Provider[.]" *Id.*

Agreement, nor does Pacer have any right to accept or refuse such a notice."[16] The email concluded that "Pacer's notice of 'acceptance' constitutes a breach" of the Agreement.[17]

## C.     The Relevant Agreement Provisions

Section 6, entitled "Term of Agreement" is the key provision at issue in these motions. Section 6(b) allows for termination for a material breach:

> Either party may terminate this Agreement for a material breach by the other party of this Agreement that is not cured within thirty (30) days' notice thereof. Termination of this Agreement will not affect the rights and obligations of the parties arising prior to such termination, and such rights and obligations will survive to the extent necessary to effectuate this Agreement for periods prior to such termination.[18]

The Agreement also permits termination "without Cause" in Section 6(c)(i):

> This Agreement may be terminated without Cause by Benchmark upon written notice to PACER Advisors, provided that Benchmark shall not have the termination date of the License occur before the end of the Initial Term of the Agreement unless a change of control of PACER Advisors which terminates the investment advisory agreement between the Trust and PACER Advisors is contemplated.[19]

The Agreement further provides in Section 6(c)(ii):

> In the event that Benchmark gives notice of its intent to terminate this Agreement in accordance with sub-section (6)(c)(i), Benchmark shall have the right but not the obligation to propose a reorganization of the Fund or Funds formed and operating hereunder with and into another registered investment company or series thereof. Any such proposal shall be subject to acceptance by the Trust in the sole discretion of the

---

[16] *Id.*, Ex. L at 1.
[17] *Id.* at 2.
[18] The Agreement § 6(b).
[19] *Id.* § 6(c)(i).

6

Trust's Board. PACER Advisors agrees that, solely for purposes of this sub-section (c)(ii), it will support any such reorganization proposal that appears to PACER Advisors to be in the best interests of the Fund's (or Funds') shareholders, provided, however, that in the event that the Fund or Funds are reorganized into another registered investment company or series thereof, Benchmark shall pay for all reasonable costs associated with obtaining Board and shareholder approval (if any), associated with such reorganization, and shall pay to PACER Advisors an amount determined according to the formula outlined in Exhibit "C".[20]

The final relevant provision indicates:

This Agreement shall terminate as to a Fund if the Trust's Board approves the termination of a Fund's use of a Benchmark Custom Index without Cause and the Fund is liquidated.[21]

Exhibit C of the Agreement expands on Section 6 as follows:

In the event that Benchmark elects to terminate this Agreement any time after the initial two-year term and in connection with such termination proposes a reorganization of one or more of the Funds pursuant to Section 6(c)(ii) hereof, and in the further event that the Board of the Trust approves said proposal (or proposals), the parties agree that the following methodology shall be used to determine the fee payable to PACER Advisors in accordance with that sub-section.[22]

### III.   RELEVANT PROCEDURAL HISTORY

This case originated in the Court of Chancery on October 20, 2022.[23] On November 22, 2022, Plaintiff filed an Amended Complaint in the Court of Chancery. On January 20, 2023, Defendant filed an Opening Brief in Support of its Motion to

---

[20] *Id.* § 6(c)(ii) (emphasis in original).
[21] *Id.* § 6(c)(iii) (emphasis in original).
[22] The Agreement, Ex. C.
[23] *Benchmark Invs. LLC v. Pacer Advisors, LLC*, Case No. 2022-0946-NAC.

Dismiss asserting the Amended Complaint no longer invoked equitable jurisdiction. On March 10, 2023, Vice Chancellor Cook granted a Motion to Transfer the case to Superior Court pursuant to 10 *Del. C.* § 1902.

On March 22, 2023, Plaintiff filed a Complaint in the Superior Court alleging three Counts.[24] On June 28, 2023, Plaintiff filed an Amended Complaint alleging three Counts:[25] (I) Declaratory Judgment;[26] (II) Breach of Contract;[27] and (III) Breach of the Implied Covenant of Good Faith and Fair Dealing.[28] The Court dismissed Count III on November 9, 2023.[29] On December 1, 2023, Defendant filed an Answer to the Amended Complaint.[30] On December 20, 2023, Defendant filed a Motion for Partial Summary Judgment as to Count I.[31] On February 29, 2024, Plaintiff filed its Motion for Partial Summary Judgment as to Count I.[32] Briefing on the cross-motions concluded on April 1, 2024.

The Court held oral argument on April 9, 2024 and reserved decision.[33] This is the Court's decision on both motions.

---

[24] D.I. 1.
[25] D.I. 10.
[26] Am. Compl. ¶¶ 110–14.
[27] *Id.* ¶¶ 115–20.
[28] *Id.* ¶¶ 121–28.
[29] D.I. 25.
[30] D.I. 26.
[31] D.I. 29.
[32] D.I. 42.
[33] D.I. 54.

## IV. STANDARD OF REVIEW

A motion for summary judgment shall be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[34]  The moving party has the initial burden, and if satisfied, "the non-moving party must sufficiently establish the 'existence of one or more genuine issues of material fact.'"[35]  A motion for summary judgment "should not be granted when material issues of fact are in dispute or if the record lacks the information necessary to determine the application of the law to the facts."[36]

The filing of cross-motions does not alter the standard for summary judgment.[37]  When there are cross-motions for summary judgment and the parties "have not argued the existence of disputed issues of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.'"[38]  The issues presented within the

---

[34] Super. Ct. Civ. R. 56(c).
[35] *See, e.g.*, *Heasley v. Allstate Prop. & Cas. Ins. Co.*, 2022 WL 951261, at *2 (Del. Super. Mar. 28, 2022) (quoting *Quality Elec. Co.  v. E. States Constr. Serv., Inc.*, 663 A.2d 488 (TABLE), 1995 WL 379125, at *3–4 (Del. 1995)).
[36] *Gateway Ests., Inc. v. New Castle Cty.*, 2015 WL 13145613, at *13 (Del. Super. Sept. 29, 2015) (citing *Bernal v. Feliciano*, 2013 WL 1871756, at *2 (Del. Super. May 1, 2013)).
[37] *See Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001)).
[38] *Gateway Ests.*, 2015 WL 13145613, at *13 (quoting Super. Ct. Civ. R. 56(h)).

cross-motions, therefore, "'are questions of law not fact, and the parties by filing cross motions for summary judgement [sic] have in effect stipulated that the issues raised by the motions are ripe for a decision on the merits.'"[39]

## V. ANALYSIS

### A. The Parties' Contentions

The cross-motions seek a declaration of whether or not Benchmark's termination notices on November 17, 2020 and April 22, 2021 (together, "the Notices") terminated the parties' Agreement. Benchmark argues the Notices did not; Pacer argues they did.

Pacer asserts Sections 6(c)(i)–(ii) of the Agreement outline that the Notices became effective in connection with the Trust's determination on October 14, 2022, regardless of whether the Trust accepted or rejected Benchmark's reorganization proposal.[40] Pacer challenges Benchmark's interpretation as inserting into the Agreement contingency language which does not exist.[41] Benchmark argues *only* Benchmark could notify Pacer that it was terminating the Agreement without cause and *only then* could Benchmark propose a reorganization to the Trust.[42]

---

[39] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Oct. 28, 2020) (quoting *Health Corp. v. Clarendon Nat. Ins. Co.*, 2009 WL 2215126, at *11 (Del. Super. July 15, 2009)).
[40] Def.'s Br. at 8.
[41] *Id.*
[42] *Id.* at 9.

Benchmark contends that the notices did not terminate the Agreement, they only indicated an *intent* to terminate at some point in the future.[43] Benchmark seeks summary judgment for two reasons: (1) the plain language of the Notices did not terminate the Agreement; and (2) the Notices did not comply with the Agreement's text on termination.[44]

As to the first reason, Benchmark argues the plain language of the Notices undermines Pacer's theory; both Notices state "intent" to terminate, not "terminating as of" a particular date.[45]

As to the second reason, Benchmark first argues Section 6(c)(ii) does contemplate a notice of an intent to terminate, subject to approval by the Trust Board.[46] By failing to include a specific date of termination in its Notices, Benchmark did not terminate the Agreement[47] nor did the Agreement terminate when the Trust Board rejected Benchmark's proposal.[48] Benchmark asserts none of the Agreement's language supports Pacer's interpretation that either acceptance or rejection would constitute a termination.[49] Benchmark maintains that because a

---

[43] Pl.'s Mot. for Part. Summ. J. as to Count I & Pl.'s Br. in Opp'n to Def.'s Mot. for Part. Summ. J. as to Count I [hereinafter "Pl.'s Opp'n Br."] at 12–13.
[44] *Id.* at 13–16.
[45] *Id.* at 13–15.
[46] *Id.* at 15–16.
[47] *Id.*
[48] *Id.* at 16–18.
[49] *Id.* at 17–18.

Section 6 terminating action did not occur, Pacer continued to serve as the Funds' investment advisor and then wrongfully repudiated the Agreement.[50]

Benchmark next argues that Pacer's alleged "acceptance" of Benchmark's intent to terminate does not effectuate termination.[51] Pacer can only terminate if there was a material breach of the Agreement, and Pacer did not provide such a reason in its acceptance letter.[52] Benchmark further asserts that "accepting" a termination does not make sense.[53] Accepting termination actually serves as an invalid and improper repudiation of the Agreement, according to Benchmark, because only the Trust can terminate the Agreement by approving Benchmark's proposal and liquidating the Fund.[54]

Benchmark argues in the alternative that Kelly's Affidavit raises a genuine issue of material fact as to what Benchmark intended when sending the notices and thus summary judgment is not appropriate.[55]

Pacer responds that *only* Benchmark can terminate without cause and the *only* way to do so is through written notice.[56] Pacer argues Section 6(c)(i) does not require a termination date and the very nature of the Agreement and the parties' situation

---

[50] *Id.*

[51] *Id.* at 18.

[52] *Id.*

[53] *Id.* at 19.

[54] *Id.*

[55] *Id.* at 20–21.

[56] Def.'s Reply Br. in Further Supp. of its Mot. for Summ. J. & Br. in Opp'n to Pl.'s Cross-Mot. for Partial Summ. J. [hereinafter "Def.'s Reply"] at 11.

makes it difficult, if not impossible, to designate a specific termination date.[57] Pacer also argues that Section 6(c)(ii) is inherently tied to 6(c)(i), not an independent path to termination.[58] Pacer contends that accepting Benchmark's interpretation—that termination is contingent on approval of the reorganization—would render Section 6(c)(i) meaningless.[59]

Pacer also asserts that Kelly's Affidavit does not pose a fact issue because the plain language of the Notices governs, not the subjective intent of the author.[60] The affidavit only indicates Kelly's misunderstanding of the legal operation of Section 6.[61]

Criticizing Pacer's lack of analysis of the Notices' language, Benchmark reiterates that the Notices did not terminate the Agreement based on their plain language.[62]

## B.    The Law on Contract Interpretation

Delaware's approach to contract interpretation is well-settled. Delaware courts adhere to an objective theory of contracts, meaning "a contract's construction

---

[57] *See id.* at 12–13.
[58] *Id.*
[59] *Id.* at 18.
[60] *Id.* at 19–20.
[61] *Id.* at 21.
[62] Pl.'s Reply Br. in Further Supp. of its Mot. for Partial Summ. J. as to Count I [hereinafter "Pl.'s Reply"] at 7–13.

should be that which would be understood by an objective, reasonable third party."[63] The court begins by considering "the parties' intentions as reflected in the four corners of the agreement."[64] A court will consider the agreement as a whole such that "a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[65] The court "will not read a contract to render a provision or term 'meaningless or illusory.'"[66]

Unambiguous and clear terms are interpreted based on their plain and ordinary meaning.[67] A contract is ambiguous when a court "may reasonably ascribe multiple and different interpretations to a contract[.]"[68] The court will decline to accept an unreasonable interpretation which "produces an absurd result or one that no reasonable person would have accepted when entering the contract."[69] If there is ambiguity, a court can consider extrinsic evidence.[70] The court determines whether

---

[63] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)) (internal quotations omitted).
[64] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)).
[65] *Id.* (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).
[66] *Osborn ex rel. Osborn*, 991 A.2d at 1159 (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).
[67] *See, e.g.*, *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56–57 (Del. 2019).
[68] *Osborn ex rel. Osborn*, 991 A.2d at 1160 (citing *Twin City Fire Ins. Co v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).
[69] *Id.* (citing *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994)).
[70] *See, e.g.*, *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 57.

or not a contract is ambiguous; the parties' disagreement over the proper interpretation of a contract does not alone render it ambiguous.[71]

## C. There are No Genuine Issues of Material Fact, so the Issue is Appropriate for Summary Judgment.

The issue underlying both motions for summary judgment is one of contract interpretation, specifically whether Benchmark's Notices constitute "termination" under the Agreement. Issues of contract interpretation are questions of law reserved for the court.[72] The parties agree the Agreement is a valid and enforceable contract, and there is no dispute what the relevant provisions are.[73]

Pacer's assertion that Kelly's Affidavit, and Kelly's subjective intent not to terminate the funds raises a genuine issue of material fact is unavailing.[74] The subjective intent of any party or a party's interpretation of the terms does not override the contractually-agreed-to terms of the Agreement. Delaware law on contract interpretation bases the parties' intentions on the language on "the four corners of the agreement."[75] The Court determines if a "termination" has occurred under the Agreement, not the parties' intentions. The Court determines that the Agreement is unambiguous[76] and therefore need not consider extrinsic evidence,

---

[71] *See, e.g.*, *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (citing *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021)).
[72] *See, e.g.*, *Paul*, 974 A.2d at 145.
[73] *See, e.g.*, Def.'s Mot. at 4–7; Pl.'s Opp'n at 5–6.
[74] Pl.'s Opp'n at 20–21 (citing Kelly Aff. at ¶ 5).
[75] *See GMG Cap. Invs., LLC*, 36 A.3d at 779.
[76] *See infra* Sections V. D–F.

15

including Kelly's Affidavit to determine the proper interpretation.[77]  Neither party alleges any other material fact dispute; therefore, the issue is appropriate for determination at summary judgment.

**D.    The Unambiguous Terms of Section 6(c) of the Agreement Explain that Benchmark Can Terminate the Agreement Upon Written Notice to Pacer.**

The relevant language of Section 6(c)(i) reads: "This Agreement may be terminated without Cause *by Benchmark* upon written notice to PACER Advisors[.]"[78]  A plain reading of this sentence indicates one way to terminate the Agreement: Benchmark provides "written notice"[79] to Pacer.  There are limitations detailed in 6(c)(i), but those limitations are not applicable here.

The immediately proceeding section, Section 6(c)(ii), reads in part: "In the event that Benchmark gives notice of its intent to terminate this Agreement *in*

---

[77] *See GMG Cap. Invs., LLC*, 36 A.3d at 779–84 (denying summary judgment where a contract was ambiguous, so the court found there was an unresolved issue of material fact as to the parties' intentions).

[78] The Agreement, § 6(c)(1) (emphasis added).

[79] "Written notice" is not a defined term in the Agreement, so the Court will attribute the common definition of the term to this Agreement.  *See, e.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.  This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.").  The Court notes that the Agreement includes notice requirements, but the requirements do not address the issues dealt with by the parties, and there are no allegations that these requirements were not met.

> **Notices.** Any notice required or permitted to be given by either party to the other shall be in writing and shall be deemed to have been given when sent by registered or certified mail, postage prepaid, return receipt requested as follows: [listing the parties' addresses].

The Agreement, § 18.

*accordance with sub-section 6(c)(i) . . .*"[80] The Court notes this "in accordance with"

language necessarily links the termination discussed in 6(c)(ii) with the method of

termination defined in Section 6(c)(i), i.e., "upon written notice." The Court

acknowledges the difference between the phrases "written notice" of termination,

and "intent to terminate," but finds this is a distinction without a difference given

the context of the two phrases here. Section (c)(ii) plainly modifies Section (c)(i)

and is thus limited by the terms of (c)(i), which broadly states "written notice," not

"intent to terminate."

The Court finds that the provisions set forth in Section (c)(ii) apply whether

Benchmark provided written notice of immediate termination (using language such

as "the Agreement is terminated upon receipt of this notice") *or* an intent to terminate

at a later date (using language such as "Benchmark intends to terminate the

Agreement when . . ."). Thus, Benchmark's argument about a termination date is

unpersuasive.[81] The plain terms of the Agreement do not require a date for

termination, only written notice of such termination. If the parties wanted specifics

in the written notice, they should have bargained to have such requirements in the

Agreement. Benchmark cannot now read in a date requirement that is not there.

---

[80] *Id.* § 6(c)(ii) (emphasis added).
[81] *See* Pl.'s Opp'n at 14–15.

The Court is similarly unmoved by Benchmark's argument that the language in the Notices proves there was no termination because it said "intent to terminate" rather than actual termination.[82] Without a more specific notice requirement in the Agreement, the Court considers these Notices sufficient to indicate termination under 6(c)(i), especially when the April Notice refers to 6(c)(ii)[83] which the Court interprets is a modifier of 6(c)(i).

Section (c)(ii) continues from the above quoted language ". . . Benchmark shall have the right but not the obligation to propose a reorganization of the Fund or Funds formed and operating hereunder with and into another registered investment company or series thereof." The plain reading of this language indicates that Benchmark, upon a written notice of termination as outlined in (c)(i), has the *right but not the obligation* to propose a reorganization. "Right but not the obligation" unambiguously means, Benchmark can choose, after providing written notice of termination, to propose a reorganization, but Benchmark is not required to do so. The logical interpretation of this language is that written notice of termination (or intent to terminate) must occur *before* Benchmark makes a proposal to reorganize. The provision does not give Benchmark an independent right to propose to reorganize without first providing written notice of termination to Pacer. The

---

[82] *See id.* at 15–16.
[83] *See* Kelly Email: April 2021.

18

Agreement could have provided Benchmark the option to propose a reorganization at any time, regardless of written notice of termination, but it failed to do so; the proposal for reorganization in 6(c)(ii) is intricately tied to the 6(c)(i) written notice of termination provision.

Delaware contract law instructs the Court to read a contract as a whole without rendering a provision superfluous or illusory.[84] Benchmark's interpretation that termination and a proposal to reorganize must occur together[85] renders 6(c)(i) superfluous. It is a more accurate reading to read 6(c)(i) as an option, and (c)(ii) as a consecutive option modifying (c)(i), rather than an entwined requirement.

Section 6(c)(ii) continues: "Any such proposal shall be subject to acceptance by the Trust in the *sole discretion* of the Trust's Board."[86] Plainly, Benchmark's proposal, made only after written notice of termination, may or may not be accepted. There is no language limiting Benchmark's ability to terminate only if there is a successful reorganization plan like Benchmark suggests.[87] Such a contingency again improperly links (c)(i) and (c)(ii) making (c)(i) on its own meaningless language.

---

[84] *See Osborn ex rel. Osborn*, 991 A.2d at 1159 (quoting *Sonitrol Hldg. Co.*, 607 A.2d at 1183).
[85] *See* Pl.'s Opp'n at 16–18.
[86] The Agreement, § 6(c)(ii) (emphasis added).
[87] *See* Pl.'s Opp'n at 16–18.

19

**E.  Section 6(b) Allows Either Party to Terminate the Agreement for an Uncured Material Breach.**

Section 6(b) of the Agreement reads: "Either party may terminate this Agreement for a material breach by the other party of this Agreement that is not cured within thirty (30) days' notice thereof."  Neither party disputes the unambiguous provision, allowing for either party to terminate the Agreement for failure to cure a material breach.[88]  The Court notes the existence of this provision to show that in 6(c), Benchmark alone has termination rights, whereas in 6(b), the parties agreed to language giving both parties the option to terminate.  The Court therefore reads this difference in the language as intentional.

Benchmark disputes the language "acceptance of termination" by Pacer to argue that Pacer does not have the right to terminate the Agreement without Cause.[89] The Court agrees: the Agreement is clear that only Benchmark can terminate without Cause.  Benchmark's argument that Pacer repudiates the Agreement by accepting termination fails, however, because, as described above, Benchmark's Notices already terminated the Agreement under 6(c)(i).

---

[88] The Court notes that "material breach" is not a defined term in the Agreement.  "Cause" is defined "for the purposes of" Section 6.  *See* The Agreement § 6(c)(iv).  No similar definition statement is given in the Agreement for "material breach."

[89] *See* Pl.'s Opp'n at 18–20.

**F.    Exhibit C of the Agreement Reinforces the Plain Reading of Section 6.**

The relevant portion of Exhibit C of the Agreement reads:

In the event that Benchmark elects to terminate this Agreement any time after the initial two-year term and in connection with such termination proposes a reorganization of one or more of the Funds pursuant to Section 6(c)(ii) hereof, and in the further event that the Board of the Trust approves said proposal (or proposals), the parties agree that the following methodology shall be used to determine the fee payable to PACER Advisors in accordance with that sub-section.[90]

As an initial matter, the Court notes Exhibit C does not contain any language of "intent to" terminate, despite referring to Section 6(c)(ii) which uses that phrasing; it only refers to when Benchmark "elects to terminate." The failure to include "intent to" suggests that the termination Benchmark is authorized to do via 6(c)(ii) is based on the termination language in 6(c)(i), which does not include the "intent to" phrase.

The Court reads the language "elects to terminate" as distinct from not just saying "terminates" to show that the termination need not be immediately effective. The language could have read "In the event that Benchmark terminates the Agreement," which would suggest a contemporaneous component. Exhibit C, however, uses the phrase "elects to" which suggests, like in 6(c)(i), that Benchmark may terminate immediately upon written notice, *or* may "elect to" terminate in the future.

---

[90] The Agreement, Ex. C.

The Court also notes that the quoted language of Exhibit C—while one sentence—is actually broken down into three separate, independent, consecutive events. The sentence begins "*[i]n the event that* Benchmark elects to terminate"[91] suggesting first that Benchmark's termination is a possibility, but not necessarily going to happen. The sentence continues "and *in connection with such termination* proposes a reorganization"[92] indicating that the reorganization proposal, may, but need not occur, after Benchmark's termination. If a proposal were required as part of Benchmark's termination, then the language "and in connection with" would be superfluous. The sentence further continues "*and in the further event* that the Board of the Trust approves said proposal (or proposals)"[93] suggesting that the Board may or may not approve the proposal as a separate, consecutive potential event. If, as Benchmark asserts, Benchmark's termination were contingent on the Board's approval of the reorganization,[94] the language "and in the further event" would be rendered meaningless. The Court, thus, declines Benchmark's interpretation of the language.

---

[91] *Id.* (emphasis added).
[92] *Id.* (emphasis added).
[93] *Id.* (emphasis added).
[94] *See* Pl.'s Opp'n at 16–18.

## VI.   CONCLUSION

The Court, therefore, determines that the Notices served as a termination under Section 6(c)(i), and the termination became effective when the Trust decided on the proposal.  Plaintiff's Motion for Partial Summary Judgment as to Count I is **DENIED** and Defendant's Motion for Partial Summary Judgment as to Count I is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**